Welcome to all of you who are participants in today's arguments or law students who are otherwise interested in this case. The fourth case of the day, Vought-Ford v. Collinan. Mr. Abrams. Thank you, your honor, and may it please the court. My name is Michael Abrams and I represent the Texas Attorney General. I will be addressing standing and Vought.org's section 1971 claim. And, or sorry, plaintiff's Anderson verdict claim. And Ms. Patterson will address plaintiff's section 1971 claim. We raised two overarching issues with respect to standing. The first is that plaintiff lacks organizational standing because it hasn't shown a concrete diversion of resources as a result of House Bill 3107. And the second argument we made is that Vought.org cannot bring claims on behalf of third party voters who are not plaintiffs in this case. And I'd like to focus on what we think is the most straightforward way to resolve this case, which is the third party standing issue. Will Ms. Patterson address standing, direct standing under 1971, or are you handling all standing? I will handle all standing. So when, why not start there? Why aren't they a directly agreed party under 1971? Don't even need to deal with third party standing. Sure. So the party agreed language is in 52 USC 10101D, which is an exhaustion requirement, but the provision that the plaintiff say provides a cause of action refers to the attorney general. And the agreed party language at most should refer to a plaintiff who, or a party who might be added as an individual in a pattern of practice case. But we would say that language in 51 or 52 10101D does not indicate a broad intent to expand standing to the full extent of article three of the constitution. And in fact, plaintiff in that record at 33, 34, specifically brought this claim under section 1983. So I think they would also, if they're pursuing that claim, they'd also have to show statutory standing under 1983, as well as under section 1971. And we don't, we don't think that they've shown. I thought they were alleging a free standing 1971. Well, if the complaint appears to bring that claim under section 1983, and that's how the United States in its amicus brief understands their claim, that it's being brought through 1983. And I can turn it. Is that how the motions panel considered it? Yes, I believe so. I think the motions panel looked at whether they could state a claim under section, had statutory standing under 1983. No, I mean, did they state that's how the claim was brought? No, I don't believe that the court reached that particular issue. So under section 19, unless there are further questions. Well, I guess is your argument primarily that the AG is, is, is the person that can bring that claim? Yes. I mean, that, that is our argument, but our argument also is that even if a private party can bring that claim, that that private party should not be a third party that doesn't actually assert voting rights. So it might be a closer question if it were a Texas voter who were sent, who was saying that the original signature requirement violated their rights under the materiality provision, but it's, it's a further leap to say that a third party that does not have voting rights can bring a materiality provision claim. And I guess the essence of their claim is sort of they're like many non-profits that distribute things, that provide things that are vendors, and therefore this original signature rule that came into place targeting that particular app they offer is about as direct and traceable an injury as you could have. So that's going to the, the article three question. Yes. Yes. I mean, I agree that the, the law was enacted because the legislature was concerned that there was a potential loophole in how the fax option was implemented but that doesn't address the question of whether there's a close relationship between the app and third party users. In all the cases... And the argument would be basically this is an app aimed especially at youth, but maybe also at elderly people, anyone that can't drive and doesn't have a printer. So they really are only going to be able to register easily if they get on the internet and sign on the internet. And this app solves that. Well, I still don't think that any court has ever gone so far as to say a free web app has a close relationship with anyone who downloads that app. If that were the case, then anyone who downloads any application these days on their phone would have a close relationship with that, with the vendor, with the proprietor of that, that app. And that seems to, to be a stretch. But in addition, and your Honor, the question went to the point of, well, what else can a voter do to vote? And so I do want to briefly address, or to register to vote. And so I want to address the Anderson verdict claim because there, the, the district court made a couple of key errors in how it evaluated that. The district court looked at the burdens on that requirement specifically and on the small number of voters who would use that option without considering the wide array of opportunities that there are to register to vote in Texas. And so, your Honor, you mentioned smartphone, right? That that might be, or someone who doesn't have a printer. But under Texas law, if you don't have a printer, but you have a smartphone, you can request from the secretary of state a postage prepaid form and the sec, online, and the secretary will mail it to you free of charge. And that's what Anderson verdict requires. It requires an analysis of the totality of the registration options that are available to Texas voters and not just in isolation, how this requirement plays out. And so if you look at the record, you can see that in Travis County, for example, something like 97% of Texans are registered or eligible voters are registered, similar numbers in Bexar County. So the record doesn't really bear out that there's any burden on Texas voters as a result of the original signature requirement. On the point you just made about if you don't have a printer that Texas secretary of state's required on your request to send you something, is that before or after you're applying to register by fax? I'm not sure I follow your, if we're talking about the same thing. Oh, sure. That would be before you register. So that is the application itself. And then you could just mail it in. And then if you wanted to, you could also submit that application by fax and then mail it in. But at that point, it would be duplicative. The fax option, which came into place in 2013, was really something that was designed to be a last chance measure for Texas voters. So in other words, you didn't drop your registration form off the day that you were supposed to, the day that it's due, but you can still find a way to fax it in and then mail it in a few days later. And so that's why most voters register through other means. But that doesn't mean that there's an Anderson-Burdick problem with that. It just means that it's one method of registering to vote in a comprehensive system. Ironically to me, the fax method actually is the method that still does preserve the old fashioned original signature. So I'm appreciative that you didn't say the wet signature rule. It is the original signature. That's right. Under 13-002, a signature has to be signed and in writing, and that's what the fax option is. So I guess this question is antecedent to how the parties have briefed it. Why isn't any time you manually, handwritten, live, naturally write out your signature? Why isn't that an original signature? Whether you do it with a stylus or whether you capture it by a photo, what they've offered here on fax is an original signature. It complies with the law. Oh, what, Vote.org is on it? Yes. Oh, okay. I see what your question is, Your Honor. Well, the app doesn't actually function that way. So what the app does is it fixes the photo. Sure. So you could take a, let's say you had a photo on your phone of a receipt from a restaurant and you had your signature on that. You could crop that and put it on the website. Why isn't that the original signature? It is a manually, handwritten, live signature. The person signed it. It's not wet, but wet isn't here. Well, I don't think that that is actually signing the registration form. That's attaching a picture of your signature to a registration form. Okay. But does DPS allow you to use a stylus? It does. So why, but therefore that's not signing the form either. Well, that's providing a signature and then having it captured with the digital format. I mean, I recognize it might be a subtle distinction, but I think that there is still a meaningful difference between taking a picture of your photograph or your whether it's on a stylus or, you know, on a piece of paper. I see I'm out of time. Yeah, I know. I'm, that's fine. Sounds like you've answered his questions. Well, I didn't need to, they, give him more time. You may not have satisfied him, but you've answered his questions.  May it please the court. My name is Autumn Hammett-Patterson and I'm representing Intervenor Appellant's Tourism Pendling. In addition to the deficiencies with plaintiff's claims that Mr. Abrams highlighted, plaintiff has not and cannot show that the original signature requirement violates section 1971 of the Civil Rights Act. Even assuming the materiality provision creates an individual right to challenge non-discriminatory requirements. And that's for two reasons. First, the requirement is material under Texas law to determine whether a person is qualified to vote. And second, the requirement does not deny anyone of the right to vote or to register. The materiality provision prohibits state actors only from denying the right to vote based on an error or omission that is not material in determining whether such individual is qualified under state law to vote. So if a requirement is material under state, according to state law, it does not violate the materiality provision. Under Texas Election Code 11.002A, being a registered voter is necessary to being a qualified voter. And under Texas Election Code 11.003B and 13.143D2, to become a registered voter via fax, an applicant must submit an original, sorry, a registration application and an original signature four days after faxing the application. So under Texas law, the original signature requirement is material to determine. Doesn't that seem very circular? If Texas decides to say you've got to pass a literacy test, well then by law you've got to. That becomes a qualification. That doesn't justify it, right? That would be stricken under 1971. So Texas can't just add qualifications that have no bearing on whether you're a qualified voter? Under the materiality provision, it directs courts to look to what is material under state law. So your answer is Texas could. It would survive a materiality attack if Texas required literacy tests. But there would be other means to challenge it. But yes, under the materiality provision, the question is what is material according to state law? This not only is consistent with the statutory text, but it's also consistent with the legislative history, including the legislative history we cite on page 17 of our recital date. Because when the district court said, why is this material? The answer was because it confirms the statements made above that relate to age and residency. Are you pressing that somehow the signature, when it's done wetly or in live, somehow confirms what's above more than affixing a signature? We do, Your Honor. We make both arguments. We argue that the original signature requirement is also material because it otherwise affirms the qualifications to vote. Because immediately above the line where the original signature is provided, the registration application states the Texas requirements of eligibility. And there's a perjury warning. But we're also arguing that the fact that the state law makes it material ends the court's analysis. The legislative history on page 17 of the reply brief discusses, the legislature was discussing the amendments to section 1971, and the proponents of those amendments that became the materiality provision argued that the materiality provision was constitutional because it does not establish substantive standards for qualifying voter registrants, but only ensures equal applications of whatever standards the state has. And because that was the harm that they were seeking to remedy was the unequal application of the standards and requirements. And so by requiring states at the outset to say what is material and what is optional, then you're not having county officials arbitrarily denying registration applications based on things that are immaterial, which that could be a problem. Do you agree that the summary judgment record, the whole thing, there's nothing in that record that says registrars are using this to verify that it is actually the applicant? It states at ROA 1198 to 99 and 1293, that officials do look for an original signature to confirm that the application is complete. And so in that way, they are looking to see if the original signature is there and thus that they have affirmed that the application survived. So it's got to be legible and it's got to be there, but it isn't cross-verifying who the person is. It is not in that way, Your Honor, no. I'd like to point... So just slow down a little bit. So the materiality, you're making two materiality arguments. One is anything Texas puts in there because they put it in as a matter of law, it is material, it survives this. That's your legal argument. Yes, if Texas law makes it mandatory. And I can give an example of something Texas law does not make mandatory, where then it could create a problem under materiality provision. And that's in Texas Election Code 13.002D. There, the statute says that if an applicant omits their middle name or a former name or a part of a zip code, that does not affect the validity of a registration application and a registration application cannot be denied on that basis. So if you had a county denying a registration application on that basis, then that could create a problem. And that shows how the materiality provision still has teeth. And we see that in Martin v. Crittenden. It's a case from the Northern District of Georgia. In that case, a plaintiff challenged Gwinnett County's practice of rejecting absentee ballots that did not have a birth date on the envelope as being immaterial. And the court concluded that they would likely prevail on that challenge because under Georgia law, that information was not required. In contrast, the district court concluded that plaintiffs likely would not prevail on their challenge to the omission of a signature or other aspects of the address because they couldn't show that that information was immaterial under state law. Also... So Texas were really worried about fraud, people saying there's somebody in their They could say, you've got to notarize the signature. That would not run afoul of 1971? It would not. Under 1971, the question is whether it is material under state law. And that's not to say that if a state imposed a hyper-technical requirement, that there wouldn't be other means to challenge it. But that conflates what Section 1971 does with other constitutional and statutory protections. For example, it's hard to imagine that a state... No, 1971 was designed specifically to tell states you can't add irrelevancies, you can't add burdens that might target the old or the young. And so here, I think their argument is, you know, if the e-signature act's been in place for 23 years, young people sign almost everything on the Internet. They don't have pen printers, especially in big states like Alaska, which apparently allows this app, or Texas, where people just can't drive to Kinko's easily. So this is, unless there's a justification, this is a very big impediment for a lot of people that might want to sign up and be a voter. That's the argument, I think. And respectfully, Your Honor, that argument goes to whether or not they have a valid Anderson-Burda claim. And it's about the assessment of burdens. But under the materiality provision, the question is whether under state law, it is material to determine a voter's qualifications. And Justice Alito's dissent for the die on the stay also says Section 1971 leaves it to the state to decide which voting rules should be mandatory. And the motions panel also agreed with this analysis. I see my time's up, so unless you have further questions. Thank you. May it please the court. My name is Uzoma Nkwansa, and I represent PlaintiffsAppelleeVote.org. I'd like to start in response to something my friend on the other side said about the materiality provision. Specifically, we heard my friend on the other side suggest that the materiality provision did not apply here because there are actual reasons for rejecting a voter registration application for lack of a wet signature. Well, I want to give just a couple of excerpts from testimony that Ms. Patterson's clients gave below. So, Real County Administrator Terry Penley was asked below, and this is on ROA 1268, you don't compare the signature on the application to anything else? Answer, no, sir. Question, do you use the wet signature on the voter registration application for any other purpose? Answer, I do not, sir. Well, Ms. Patterson today is saying she acknowledged that, I heard her say. She acknowledged those records. She's saying Texas can put whatever they want in there, and that makes it material. And Texas absolutely cannot do that. The Congress anticipated this type of circular reasoning, and in fact, imposed certain provisions that such reasoning did not deprive individuals of the right to vote. And I'll give you an example of some of those provisions. For instance, subsection E defines vote to include registration and other preconditions to voting. In other words, denying someone the ability to register is just the same as denying them a ballot under the Civil Rights Act and under section 101 of the Civil Rights Act. You cannot deny someone the ability to register. You cannot reject the registration application simply because of an immaterial omission. So to suggest that because registration is a prequalification for voting, that therefore Texas can impose any rule it wants for registration, that effectively contradicts the statute. Well, I would think then there'd be at least several 1971 cases where states have said, well, we're going to deem this to be material. We want the signature to be witnessed, or whatever it is they add, and have those been stricken. Can you point to case law? Yes. For instance, in Schreyer v. Cox, the Georgia legislature imposed a requirement that individuals enter their full Social Security number. And the 11th Circuit affirmed the ruling of the Northern District of Georgia that found that that requirement was not material to determine the qualifications of voters. And the term qualification is important here, because the state just doesn't get to define qualification however it wants. Correct. It's correct that it refers to qualifications to vote under state law. However, qualifications should be considered substantively. What is substantively a qualification to vote? And it's not any rule that the state decides to add to the voting process. And if you think about all of the states that require individuals to be registered in order to vote, then that would suggest that all of those states can define what it means to register and impose whatever type of restriction, including, as Your Honor mentioned, a literacy test, even. And that would somehow be outside the purview of the Civil Rights Act. That renders the act meaningless. 1971 itself bars certain things, such as literacy tests. And I think her point would just be, if it's barred by the act, obviously that can't be added back in by the state statute. Isn't that correct? Literacy tests are one of the things barred by 1971? It's discriminatory. 101, subpart A2, C, or something like this. Anyway, the case you just cited, it does seem to me that it may not control the outcome of the case, what to make of this materiality, because you still say, you still argue that Anson Burdick has to be able to be applied to it and survive that kind of regime. So did the case you cited to us deal with that, about whether materiality really means refer to state law, but it still has to pass some subsequent analysis? So the state I cited only dealt with the materiality provision of the Civil Rights Act. So it did not deal with the Anderson Burdick test. The Anderson Burdick test, which requires the courts to balance the burden on the right to vote with the state interest, that is a separate claim. But even if we were to... It was a way to make her argument still fit with what your goal is, it seems to me. And so it's a matter of statutory interpretation of whether she's wrong about how to read materiality. Certainly, and the reason why that interpretation is wrong is because Congress defined votes to include registration, which means registration cannot, and registration, everything that's required to register, cannot be made a qualification to vote because Congress defined votes to mean registration. And that would undermine and render that definition meaningless. What if Texas said, we don't want any middlemen, we want the applicant to interface with the official? So these third-party vendors you use, would that run afoul of the materiality provision? Not necessarily. Right. If the rule were voters have to interface directly with the registrar, then you would look to the text of the materiality provision, and it's not a limitless provision. There are some specific limiting factors. For instance, it applies to errors and omissions on a paper or application or a form. And if there was a rule saying voters have to interface with someone, it's not clear whether that's an omission on a form or error on a form. So there are some limits there, but allowing the state to define registration as a qualification is not one of them. That completely contradicts the spirit of the law and the text of the law itself. I guess I'm wondering, if we were to accept the logic of your read of the materiality provision, why would Texas even be able to require that the hard copy be sent at all? What's that material to? Well, I think that's not the case before the court, but I will answer your question directly. That may be material to determining whether the individual meets qualifications, because there's information on that form that requires the individual to sign. Right, but I'm assuming the app populates the relevant qualifications. You affix the photo and you send it directly. Why wouldn't the logic of your argument allow you to attack many other ministerial points? And maybe, what are the three qualifications to be a voter in Texas? Residency, age, and citizenship? Yes. Okay, so if that's already in your state ID, when you go to vote and you show them the ID, why wouldn't the logic of your argument be that you don't even have, Texas can't require registration at all? Well, it goes back to the statutory language I pointed to, which is the materiality provision is focused on errors and omissions on a form itself. So it contemplates a form. It contemplates a form. It contemplates an error or omission on that form. So this is not the type of slippery slope that opposing counsel may suggest where every little ministerial rule may be included here. This specifically refers to the practice of requiring or rejecting applications for immaterial omissions and errors that are on a form. And that's exactly what we have here. Whether the signature appears as a wet ink signature or whether it appears as an image, that is immaterial and that is what the defendants in this case, including the interveners, testify to. They testify that they do not use the wet signature for anything. They just look at the application to determine whether the signature is wet. The word wet is nowhere in this case except in Reese, correct? We're talking about an original signature. Correct. But you aren't arguing that what's there visually is an original handwritten signature, are you? In other words, I guess maybe this backdoors into standing. Without an aggrieved applicant who was denied the right to vote, how do we actually know that what you all send in would be rejected? Well, we know that because it was established in the record. Because the county registrars testify that they rejected applications. They were told to by the secretary, correct? First they were told to by the secretary. Because the secretary is not the right defendant. Correct. Because the secretary does not control their voter registration decisions. But they followed the guidance of the secretary and implemented this rule or this practice. And then HB 3107 came along and they continued to implement this practice. And now we're pointing to HB 3107 as a source of authority for this practice. So regardless of whether it's a rule or a practice they implemented because the secretary said so or because of HB 3107. I guess what I'm saying is we know DPS allows applicants to use a stylus. So the digital capture of the natural signature occurs. Texas does that, correct? Correct. How is this any different? This is an original natural signature that's captured electronically. Isn't it exactly the same thing? It is not different at all. It is exactly the same thing. It is just precluded. So how do we know it will be rejected other than sort of atmospherics? And to turn this into a specific question, it gets to standing. What's your best case that a nonprofit organization, so not a commercial vendor, can represent the interests of people it serves wonderfully, Texans who want to vote? So there are two questions in there and I'll answer them in turn. So the first question is how do we know that it will be rejected? We know because the county registrars have been rejecting these applications. They testify to that. And we have unrebutted expert testimony showing, based on records submitted by these defendants. But no court has said that. You're not asking us to certify that question. It looks to me like an original signature, to be honest. It's not a wet signature, but it sure looks like, identically, the original signature that Texas accepts. We're not asking to certify the question because it's not necessarily outcome determinative for our case. Because what plaintiffs are challenged, what Vote.org is challenging here, is the practice of rejecting applications for lack of a wet signature. So whether that occurs because the law requires it. My colleagues may have questions, but they'll ask you if they do, the standing question. What's your best case for a 1971 standing from a third party? So there are several, actually. First I'll start with the line of cases from the Supreme Court that are recognized, starting with Craig v. Bourne and its progeny, that have recognized that a vendor or someone in life position has uniformly been allowed to enforce the interests of its vendees or service provider can enforce the interests of its service recipients when there's a provision or when there's a law that restricts its function. And that's exactly what happened here. You don't even have to guess whether there's a law that restricts Vote.org's function. The Secretary of State admitted that it dragged the language of this provision specifically to target Vote.org's web application. So in addition to that line of cases, which goes from the Supreme Court precedent to Hang On, which we've, Hang On from the Fifth Circuit, which we cited in our brief, and Reliable Solutions from the Fifth Circuit, which we cited in our brief, both cases involve businesses or organizations asserting claims, asserting the interests of their patrons, of the folks that they provide services to. And now I understand that there's some argument that this may not extend to a nonprofit organization because it's not a commercial enterprise. And that's just entirely backwards. Because when you look at what's driving this doctrine, what's driving this doctrine is the courts have made an assumption that there's an identity of interest between the service provider and the group of individuals it provides those services to. The courts have made that assumption and have not proceeded to test other elements of third party standing because of that assumption. Well, whatever interest there is, whatever identity of interest there is between a profit-making enterprise and its customers, that interest is at its apex when you are dealing with an that use its application and uses its services. Counsel, I have two questions for you just for the purposes of this record. What if any evidence is there in the record of your organization providing printers in other states? So our organization providing printers in other states, that appears in testimony from the ROA 2048-49 and 2043-44. And specifically, Ms. Haley testified about Vote.org's Next Door program. So in Texas, when this wet signature rule came down, Vote.org... No, I'm asking you what assistance do you provide in other states as far as providing printers? You're saying you have to provide printers in Texas. Do you provide printers in other states? Not necessarily. Not necessarily. Do you provide them or do you not? Vote.org partners with Next Door to provide access to printers. So Vote.org doesn't physically provide printers, but they partner with Next Door to provide access to printers. In other states? In other states. How many other states? I'm not sure the exact number of states, Your Honor. It depends on the rules in each state. So in Texas, Vote.org has to connect with Next Door and partner with Next Door to allow people to use printers, specifically because there's a wet signature rule. The other question I have for you is, assuming the summary judgment in this case is vacated, what if any evidence would be presented at a trial that is not already in the record? And I'm going to ask the same of Omer Buttle. Would there be any new evidence that would be presented? Well, it depends on the grounds for which the summary judgment was vacated. If it was based on standing, for instance, we would present additional evidence that shows clearly that, in addition to the testimony that we've already presented, that shows that Vote.org had to divert resources from its nationwide programs and from HBCU programs and influencer programs. I see that my time is up. May I? Please answer the question. Sure. It would divert resources from its influencer programs, which Vote.org has testified to, to connecting voters with printers in Texas, specifically because of that wet signature rule. And if that rule were not in place, Vote.org would be able to have its constituents in Texas just use the app. And Vote.org can redirect resources to its programs around the country, to its HBCU programs around the country, and to its youth influencer programs around the country. So for a small, nimble organization with a handful of engineers that's turned into the largest geotelevision technology platform, that's a significant injury. So to briefly conclude, in the state of Texas... Well, you've answered my question. Thank you. Thank you, Your Honor. May it please the Court, no, Pat Lindell for the United States. I'd like to start out with a series of questions that Judge Higginson was asking opposing counsel about the meaning of the materiality provision in this question of when you are qualified and what states can do. And the reading that the other side has put forward here, that essentially anything that to essentially leave out the materiality provision goes against the definition of vote in the statute, which expressly modifies the phrase qualified under state law to vote. Because the statutory definition of vote includes registration. So you have to plug that in, that addition to the plain meaning controls. And so instead, you're looking at this stage of the voting process at what are the qualifications to register to vote. And Texas has a statute that lays those out. It's Texas Election Code Section 13.001. And it looks extremely similar to the statute on eligibility to vote. It's just missing one thing, which is being a registered voter. Because in order to register, you can't already be a registered voter. And those qualifications listed out in that statute are the ones to which the requirement at issue here needs to be material. And those are residence, age, citizenship, not being a felon. And here, the summary judgment record clearly showed that the wet signature rule, the requirement of a wet signature in particular, is not material to meeting any of those qualifications. It's not being used, certainly not directly, the only state interest being put forward were these sort of indirect interests in determining someone's identity or determining the truthfulness of their statements on the form. And all of the summary judgment evidence showed that these, whether it is a wet signature or not, is not being used to meet any of those purposes. Because your time's limited, what will help me would be cases. So what's your best case applying 1971 to strike down a state law requirement like this? So I think the Third Circuit's decision in Migliore, which of course was vacated as moot by the Supreme Court, but that doesn't affect its substantive analysis. There, it struck down a requirement that you include the date on the back of your absentee ballot envelope, which is a state law. But the Third Circuit said that that is not material to meeting any of your qualifications, either to vote or to cast and have this ballot counted. And the best standing case to extend to outside of a commercial vendor context, or would the government's view be that Voter Org is bringing this directly as an agreed party under 1971, or is it both? The United States does not take a position on any of these standing issues. And I'm asking you for your insight into that. We, again, I don't have anything for you because we haven't taken a position on this and we haven't asked for or received authorization to do it, so I can't really speak to that. One thing that I will say on those standing issues, because they're sort of getting entangled with one another, just to separate them out a bit, there's Article III, there is whether they're statutory standing under 1983, and then there's the personal right issue under this particular statute. And I will say that it's not really clear that the interveners preserved that particular argument, that last one. They did not say anything in their summary judgment briefs, ROA 1038 to 1039 and 1050 to 1054, those are the relevant pages of their summary judgment briefs, and they didn't say anything about it. Is the relief requested under the statutory argument the same as the constitutional relief? Are you asking for the same relief? My understanding is that it is, I'm not 100% sure, but I believe that they're seeking the same relief. They're simply asking to not have the defendants, these registrars, reject people's applications because of this immaterial error. One other thing that I would like to address, Judge Southwick, your question about whether the sort of Anderson-Burdick analysis gets sort of smuggled into this statute, and it does not. It's a key difference between the materiality provision claim and their Anderson-Burdick claim. As opposing counsel pointed out, there is no freestanding burden interest balancing test under the materiality provision. The text of the provision lays out one specific test, and it is whether this particular rule is material to meeting the qualifications that are set out to register, and it is not. Any questions about the burdens that it imposes on people or whether there's some sort of freestanding interest that the record does not support does not come into play under this particular claim. But to the extent it's something that you can take a position on representing DOJ, did the motions panel get anything right? Well, again, yeah, on the standing issues, we don't take a position on those questions. As to everything that it dealt with on the materiality provision, which is what we came in on, we think that it essentially got everything wrong. So there is a private right of action. I'm sorry. Is it all right if I finish? Oh, please do. I did ask a question. Thank you. Sorry. They did not exactly say whether there is a private right of action, but there clearly is a private right of action to enforce the statute under Section 1983. They adopted this rule as to what sorts of rules the states may put forward that goes against the impetus for this law, which was, among other things, the Louisiana state constitutional provision that said that you have to list your age in years, months, and days. And people were being rejected, having their applications rejected, because they missed the number of days in their age. That was a state constitutional provision. And yet, this law was passed in significant part to get rid of requirements like that. So I think that's it. All right, counsel. Thank you very much. Appreciate it. Mr. Abrams. Thank you, Your Honor. First, in response to Judge Barksdale's question, we think we offered a pretty fulsome record on summary judgment. I'm not sure that there would be a lot more to do on remand, except expand on some of         It's not a state statute. It's not a state statute. It's not a state statute. It's not a state statute. on cross motions. And so Vote.org bore the burden of showing both conclusively that they had standing, and that there was no issue of material fact that this violated the Constitution. I think at a minimum, there's a fact issue on the Anderson verdict claim, because the state introduced substantial evidence about the minimal burden and the state's interest in ensuring that something like what happened in 2008, where multiple voters potentially didn't have their registration form sent in properly, because the signatures were so difficult to read, and making sure something like that wouldn't happen again. And that goes to the core interest that the state has in this requirement. What, if anything, is in the record concerning Texas's interest or feeling, for want of a better term, that there's more security in a signature handwritten than in a signature sent in by a photo? I think that Is anything in the record? I think what's in the record that the state relied on is what happened in 2018, where what happened was, using Vote.org's app, something like 259 applications that were supposed to go to Dallas County didn't get sent in in the first place. And both Travis County, and Bexar County, and Cameron County, three of the four county defendants testified that they had a lot of problems with reviewing about 15% of the applications that were submitted. And so that's the state's interest. Unlike sometimes when a state passed an election law, and it's prophylactic, and we're just trying to look ahead about what could happen, here the state had tangible evidence in 2018 of what went wrong when this original signature requirement was misconstrued. I also wanted to address the third party standing issue in the Craig v. Warren line of cases. So I think the bottom line test is there still has to be a close relationship between the parties that are affected, and there has to be some hindrance to that party being able to bring a claim. And I wanted to raise the hindrance issue too. I'm not sure if there's any reason that a Texas voter who had an issue with this requirement couldn't bring this claim on their own. They could bring a claim under Section 1983 and potentially recover attorney's fees under Section 1988, so it shouldn't be difficult to find an attorney. Some of the biggest cases that this court has seen in the last five years in the election contest have involved individual plaintiffs bringing suit and thinking the vote by mail case, for example, from a couple years ago, there were three individual plaintiffs there. So there's no real reason that a voter couldn't bring this claim, but I think the reason there isn't any evidence in the record of an actual voter being hurt by this requirement is because there's no reason that a voter wouldn't find another way to register. There are just so many avenues, and we cite some of them in our briefs, some of them are in Chapter 13 of the election code, that if the fax option wouldn't work, there are other ways to register, and that's why there's no evidence in this record that the court can evaluate about what the actual burden of this requirement is. And finally, on the materiality provision claim, my friend on the other side said that they were making a slippery slope argument, but I'm not sure under their reasoning why a signature would be material at all, if they're correct. If we can't require an original signature requirement, I'm not sure why we can require a signature at all, but a signature is essential because it's right beneath on the form the three categories to be a registered voter, which is you have to be a citizen, you have to not have a mental impairment or incapacity, and you cannot be a convicted felon. So it's important that Texas voters actually look at those requirements and sign them before they submit the application, and that's the interest that advances. All right, Councilman. Thank you. Thank you to all of you and the other advocates this morning for bringing these cases to us. We are in recess.